**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**J. Chandler PETERSON, Defendant–
Appellant.**

**No. 95–40820.**

United States Court of Appeals,
Fifth Circuit.

Nov. 27, 1996.

---

Tom N. Kiehnhoff, Office of the U.S. Atty, Beaumont, TX, John Malcolm Bales, Asst. U.S. Atty, Lufkin, TX, for plaintiff-appellee.

G. Patrick Black, Office of the Federal Public Defender, Tyler, TX, for defendant-appellant.

Before DAVIS and DENNIS, Circuit Judges, and FALLON [1], District Judge.

FALLON, District Judge:

On May 9, 1995, a jury convicted J. Chandler Peterson of violating SEC Rule 10b–5 in connection with a sale of securities to the Pipefitters Local No. 195 Pension Trust Fund in Nederland, Texas. *See* 15 U.S.C. § 78(b); 17 C.F.R. § 240.10b–5. The defendant has appealed his conviction alleging that the evidence presented by the Government was insufficient to support a judgment of conviction and that the trial count improperly instructed the jury on good faith and reliance on counsel. In the alternative, the appellant contends the trial court improperly calculated his offense level under the United States Sentencing Guidelines by finding that the

total amount of loss attributable to the defendant's conduct was $1,413,142.00. For the following reasons, we affirm the defendant's conviction and vacate the sentence imposed and remand this matter for re-sentencing.

## I

### FACTS AND PROCEEDINGS

J. Chandler Peterson was an entrepreneur on a grand scale. One of Peterson's major financial enterprises was American Business Funds, Ltd. 1983 (ABFL) which was formed as a Limited Partnership in October 1983. The stated purpose of ABFL was to invest in leveraged buyouts, venture capital entities, and other "investments to achieve capital gains." The general partners of ABFL were Phoenix Management Corporation (Phoenix), in which Peterson was the principal shareholder and chairman of the board of directors, and Peterson in his individual capacity.[2] Thus, Peterson was solely responsible for ABFL's Discretionary Investment Fund, the monitoring of investments and cash distributions to the limited partners.

In May of 1984, Miguel Duenas became a limited partner in ABFL by purchasing six "units" at $150,000 per unit for a total investment of $900,000. By 1987 Duenas was unhappy with Peterson's handling of the ABFL. Specifically, Duenas contended that Peterson had failed to make distributions to the limited partners per the partnership agreement contained in the Private Placement Memorandum.[3] Initially, Duenas sought to have Peterson distribute investment returns through amicable means. This method failed and on May 24, 1988 Duenas filed a civil complaint in state court in Dade County, Florida against Peterson, Phoenix, and the ABFL. The complaint was personally served on Peterson on May 26, 1988.

The Duenas complaint lies at the heart of this case. In the complaint Duenas stated

---

1. District Judge of the Eastern District of Louisiana, sitting by designation.

2. In 1983 there was an additional general partner of ABFL who was eventually bought out by Peterson before the events surrounding this matter occurred.

3. The Private Placement Memorandum was prepared at the time units of ABFL were originally offered and governed how distributions were to be handled.

the terms and conditions which he felt governed the ABFL along with the alleged violations of the partnership agreement which Duenas claimed had occurred. Specifically, the Duenas' complaint asserted that Peterson had breached his legal and fiduciary duties to ABFL's limited partners. According to Duenas Peterson (1) loaned ABFL funds to himself and others for the purchase of an Arizona bank, (2) paid himself $700,000 from ABFL funds in connection with "acquisition financing" of another company, and (3) refused to distribute the returns of partnership investments as required by the limited partnership agreement. Duenas based this third claim on a 1983 amendment to the ABFL limited partnership agreement. This amendment was contained in the ABFL Private Placement Memorandum Duenas received upon purchasing his ABFL interest. The provision, as interpreted by Duenas, required that Peterson access ABFL's cash position every six months and distribute within sixty days any reserves not necessary for payment of expenses or other indebtedness. According to Duenas, "reinvestment" did not qualify as an expense or debt.

In addition to damages, Duenas sought a declaratory judgment affirming that the limited partnership agreement required ABFL's general partners, Peterson and his company, to distribute returns rather than reinvest them. Furthermore, Duenas contended in two counts—one on his behalf and one on behalf of the ABFL—that Peterson committed a breach of fiduciary duty not limited to the duty to deal with Duenas and the ABFL's property "honestly and in strictest good faith." In short, the Duenas suit alleged that Peterson had managed ABFL improperly and, thereby, breached his fiduciary duty.

The Duenas suit placed Peterson in a very awkward position: a major investor in ABFL wanted out, had made serious allegations of wrong doing, and had exposed him to possibly large financial losses.

It was at this point that the Pipe Fitters Local 195 Pension Trust Fund (Local 195) entered the picture. During the early part of May 1988 two trustees of Local 195 attended a workshop on investment in Dallas, Texas which was presented by J. Chandler Peterson. Peterson apparently impressed the trustees and was asked to make a presentation to the entire board.

On June 2, 1988, Peterson traveled to Nederland, Texas to make his pitch to the Local 195 Board of Trustees. During Peterson's presentation to Local 195, he convinced the fund trustees to purchase almost $1 million worth of limited partnership "units" in the ABFL. He described the ABFL deal as a "limited window of opportunity" to obtain "windfall profits." In the near future, he explained, ABFL would receive a substantial return from an investment in an ammunition company called Federal Cartridge. Therefore, he advised the board that they would receive a distribution of $100,000 in sixty to ninety days of their initial million dollar investment. Peterson also stated that the opportunity had arisen because a current limited partner was in need of cash. On June 2, 1988, the same day Peterson made his presentation to the pension trustees, they voted to invest in ABFL. Before the meeting, according to Peterson he met with the union's manager, Mack Roberts, at which time he claims he disclosed the pending lawsuit and asked Robert's how to handle the lawsuit with the board. Roberts allegedly told Peterson he, Roberts, would "handle it." At trial Roberts denied that this conversation ever took place. The jury in the instant matter believed Roberts and not Peterson. The jury concluded Peterson never disclosed to the trustees the existence of the Duenas lawsuit.

After receiving the million dollar payment from Local 195 Peterson paid Duenas $940,-000 for his "units" and transferred those "units" to Local 195. At this point the Duenas lawsuit was settled and dismissed. On July 7 and again on August 4, the trustees were informed that their investment had already yielded approximately $100,000 in returns which they would receive on September 1. On September 28, however, they received only $45,558 which fell far short of the promised $100,000. Peterson explained that the general partner had elected to reinvest the balance at this time. No funds were distributed by Peterson in 1989. By

the middle of 1989 Peterson had been removed as the head of ABFL and the company placed in receivership as a result of a Georgia lawsuit by unhappy ABFL investors.

At trial the United States contended that Peterson convinced union trustees to invest in ABFL through knowing misrepresentations and omissions of material fact in violation of Title 15, United States Code §§ 78j(b) and 78ff and Rule 10b–5 (17 C.F.R. § 240.10b–5) (commonly referred to as a Rule 10b–5 violation). It was the governments position that Peterson's failure to inform the trustees of the Duenas suit constituted a "material" omission. According to the United States, would-be investors would be adversely influenced by a suit "challenging [Peterson's] honesty" in deciding whether to purchase units of ABFL. Additionally, the Government also argued that Peterson knowingly misrepresented the amount of the "windfall returns" the pension would receive. Moreover, according to the government, Peterson lied when he told the trustees that the ABFL units were available because their current owner needed cash. In fact, the limited partner he was referring to was Miguel Duenas who, as explained above, had recently filed suit in Dade County, Florida against Peterson and Phoenix, the general partners in ABFL. The cash was in fact needed to settle the Duenas suit.

At trial a jury concluded that the United States' position was supported by the evidence and found Peterson guilty of securities fraud.

## II

### ANALYSIS

A. Sufficiency of the evidence.

■ Under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5, the Government must prove that the defendant:

(1) knowingly and willfully, (2) through use of the instrumentalities of commerce and the mails and (3) in connection with the purchase or sale of a security, (4) used manipulative and deceptive devices in violation of Rule 10b–5 by (a) employing any device, scheme, or artifice to defraud, (b) making any untrue statement of material fact or omitting to state a material fact necessary in order to make the statement, under the circumstances, not misleading, or engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit.

Peterson contends that the United States did not introduce sufficient evidence of the last element concerning manipulation and deception by making an untrue statement of material fact or omitting to state a material fact. The defendant asserts that he did not fail to mention the Duenas lawsuit and, if he did, it was not a material omission. Furthermore, he argues that he did not promise an automatic $100,000 distribution. A jury, after hearing all the evidence, found otherwise.

This Court will not disturb a jury's verdict unless the record demonstrates that a rational jury could not have found each of the elements of the offense beyond a reasonable doubt. *See United States v. Ruggiero*, 56 F.3d 647, 654 (5th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 397, 133 L.Ed.2d 317 (1995). In applying this standard, we must view the evidence, and all inferences reasonably drawn from it, in the light most favorable to the verdict, regardless of whether the conviction is based on direct or circumstantial evidence. *Id.*

First, the defendant asserts the evidence does not demonstrate that he failed to disclose the existence of the Duenas suit to the trustees of Local 195. Peterson refers this court to the conversation he claimed to have had with Mack Roberts. Roberts, however, denied discussing the Duenas suit with Peterson, and the jury was entitled to believe Roberts and they did. *United States v. McCord*, 33 F.3d 1434, 1439 (5th Cir.1994) (discussing the jury's role in evaluating the credibility of witnesses); *United States v. Boone*, 951 F.2d 1526, 1536 (9th Cir.1991).

■ The defendant also suggests that, because he told trustees they were purchasing shares from an existing partner, he did not fail to disclose the Duenas suit. This argument ignores the obvious. While Peterson's disclosure to the trustees that they were

buying shares from a limited partner in need of cash may have been true it was no substitute for disclosing the fact that the same limited partner was suing him for a breach of fiduciary duty and for mismanaging the very fund he wished them to invest one million dollars. A rational trier of fact could have found that Peterson failed to inform the trustees about the Duenas suit.

■ In the alternative, the defendant argues that if he did "neglect" to disclose the Duenas litigation, his omission was not "material." An omitted or misrepresented fact is material in a Rule 10b–5 case if there is a substantial likelihood that a reasonable investor would have viewed it as significantly altering the mix of information available. *Basic v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). Because materiality is a mixed question of law and fact, it is usually left for the jury. *Sioux, Ltd., Securities Litig. v. Coopers & Lybrand*, 914 F.2d 61, 65 (5th Cir.1990); *See also TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2132–33, 48 L.Ed.2d 757 (1976). Therefore, the issue is how a reasonable investor would have reacted to a disclosure by Peterson that he was being sued by a current limited partner for failing to distribute profits as required by the partnership agreement, loaning partnership money to himself and others, and paying himself finders fees from partnership funds. All of which the suing investor believed were in violation of the limited partnership agreement Local 195 was to join.

The defendant, in an attempt to minimize the importance of the Duenas lawsuit, has attempted to characterize it as simply a declaratory judgment action seeking to determine the rights of the parties. This argument ignores the plain language of the complaint. The Duenas lawsuit alleged numerous facts, outlined above, which constituted a serious breach of Peterson's fiduciary duty to the limited partners. Additionally, the suit prayed for four separate forms of relief in which only Count Four requested a declaratory judgment. The remaining three counts alleged a breach of contract and two breaches of fiduciary duty, all seeking monetary relief.

The Duenas suit did not simply ask to have the rights of the parties determined but sought to expose Peterson for the wrongful conduct that Duenas believed has occurred and recover money damages for those wrongs.

We believe that common sense alone suggests that the Duenas lawsuit was highly significant information which would have likely altered the " 'total mix' of information." *Levinson*, 485 U.S. at 232, 108 S.Ct. at 983, *quoting TSC Industries*, 426 U.S. at 449, 96 S.Ct. at 2132. The investor in this case, Local 195, was prepared to invest one million dollars, a significant amount of money, in ABFL as a limited partner. As a limited partner, Local 195 would have no control over this money once it was transferred and no say over how it was invested. Complete trust in Peterson to properly manage their money had to be a significant factor to the trustees of Local 195. The Duenas lawsuit brought into question Peterson's honesty and ability to effectively manage the ABFL as a fiduciary of the limited partners. *See S.E.C. v. Electronics Warehouse, Inc.*, 689 F.Supp. 53, 66–67 (D.Conn.1988), *aff'd*, 891 F.2d 457 (2nd Cir.1989), *cert. denied*, 496 U.S. 942, 110 S.Ct. 3228, 110 L.Ed.2d 674 (1990) (discussing the importance of the disclosure of a criminal action against the president of a company despite the president's belief the indictment would be dismissed). Clearly, the suggestion that ABFL had not been distributing profits would influence an investor such as Local 195 which was looking for fast income and return. Any information that the general partner had been accused of acting improperly toward his limited partners would make a reasonable, would-be limited partner wary. It was rational for the jury to find that the failure of Peterson to disclose the Duenas lawsuit was a material omission.

Additionally, the United States put forth evidence that Peterson's failure to tell the trustees about the Duenas suit was not his only "manipulation." The evidence showed that Peterson promised Local 195 immediate, large returns, while he was currently reinvesting large sums and paying out nothing. Peterson contends that he was simply "puffing" and quibbles about the difference

between "returns" and "distributions." However, he apparently failed to explain this difference to the trustees when he promised them "windfall profits." *See Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 203 (5th Cir.1988). Again, it was rational for the jury to find, on the evidence presented, that Peterson knowingly misrepresented the amount of quick money the trustees would receive.

**B. Challenge to the jury charge.**

Peterson next challenges his conviction on the grounds that the district court committed reversible error in refusing to submit to the jury two proposed instructions concerning good faith reliance on counsel and basic good faith.

 A district court's refusal to give a requested instruction is reviewed for abuse of discretion. *United States v. Clements,* 73 F.3d 1330, 1338 (5th Cir.1996). Jury instructions are reviewed "to determine whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *Id., quoting United States v. Box,* 50 F.3d 345, 353 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 309, 133 L.Ed.2d 213 (1995). In evaluating Peterson's claim, this Court considers whether the proffered instructions (1) represented a substantially correct statement of the law; (2) whether they

were substantially given in the charge as a whole; and (3) concerned an important aspect of the trial so that their omission seriously impaired the defendant's ability to present a defense. *United States v. Pennington,* 20 F.3d 593, 600 (5th Cir.1994). A defendant is only entitled to a charge if it is supported by the law and by some evidence in the record. *United States v. Tannehill,* 49 F.3d 1049, 1057 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 167, 133 L.Ed.2d 109 (1995).

**.i). *Good Faith Reliance on Advice of Counsel.***

 A good faith reliance on the advice of counsel is not a defense to securities fraud. It is simply a means of demonstrating good faith and represents possible evidence of an absence of any intent to defraud. In the instant matter the defendant requested a good faith reliance on counsel charge which consisted of two sections. The first section of the requested charge sought to define good faith generally while the second discussed when reliance on the advice of counsel may constitute good faith.[4]

 The reliance-on-counsel charge actually given by the trial court was almost identical to the second section of the instruction requested by the defendant.[5] The key difference is that the Court's instruction clarified that the defendant must have relied on his

---

4. The defendant requested the following charge entitled "Good Faith; Reliance on Counsel":

A person does not commit a deliberate fraud if his words and actions are done in *good faith.* A person is entitled to pursue a business idea even if it is new or risky. A person speaks or acts in *good faith* if: (1) *He honestly believes that what he says is true;* or (2) He honestly believes that his business idea is practical and has a reasonable chance of success even though you might believe with the benefit of hindsight that the plan was impractical and unlikely to succeed; or (3) *He honestly intends to carry out his promises.*

Reliance on the advice of an attorney or expert may constitute good faith. To decide whether any such reliance was in good faith, you may consider among other things the following factors: (1) Whether the Defendant sought the advice of a competent expert or attorney; (2) Whether the Defendant gave his attorney or expert all of the relevant facts

known to him at the time; (3) Whether the Defendant received an opinion from his attorney or expert; (4) whether the Defendant believed the opinion was given in good faith; and (5) Whether the Defendant reasonably followed the opinion. (emphasis added)

5. The court charged the jury on "Reliance on Counsel" as follows:

Reliance on the advice of an attorney may constitute good faith. To decide whether such reliance was in good faith, you may consider whether the Defendant sought the advice of a competent attorney *concerning the material fact allegedly omitted or misrepresented,* whether the Defendant gave his attorney all the relevant facts known to him at the time, whether the Defendant received an opinion from his attorney, whether the Defendant believed the opinion was given in good faith and whether the defendant reasonably followed the opinion. (emphasis added)

attorneys in connection with the omission or misrepresentation alleged by the Government. The district court did not abuse its discretion in including this phrase within the defendant's requested charge.

The question remains whether the court abused its discretion in rejecting the first half of Peterson's proposed good faith reliance on counsel instruction.[6] The district court charged the jury that "[T]he Defendant's good faith belief in the truth of the statements made by him is a defense however inaccurate or misleading the statements or omissions turn out to be." The district court did not abuse its discretion in rejecting a portion of Peterson's "reliance" charge. This was substantially covered by the court's charge, when taken as a whole. *See Pennington*, 20 F.3d at 600.

■ The statements that "[a] person is entitled to pursue a business idea even if it is new and risky" and that a person acts in good faith if "[h]e reasonably believes that his business ideas is practical and has a reasonable chance of success ..." in the defendant's proposed instruction do not fit the facts of this case. The Government's theory was that the defendant intentionally misrepresented and failed to disclose material facts in order to induce the trustees to buy Duenas' ABFL units. The Government never claimed nor argued that Peterson tricked the trustees into investing in a risky venture. Moreover, the practicality or reasonableness of the defendant's business ideas were not at issue. The defendant was accused of misrepresenting facts which went to his ability to effectively and honestly manage the ABFL.

The district court did not abuse its discretion in refusing to give this portion of the defendant's reliance charge. This instruction did not relate to an important aspect of the trial such that the district court's failure to include this part of the defendant's proposed instruction did not seriously impair the defendant's defense. *See id.*

ii). *Good Faith.*

■ The "good faith" charge requested by the defense and the one given by the court differ significantly. The defendant proffered a lengthy charge covering fraud, fraudulent intent and good faith.[7] This instruction was taken *verbatim* from the sec-

---

6. The first section of the proffered instruction entitled "Good Faith; Reliance on Counsel" does not deal with "reliance on counsel" and simply addresses the general concept of good faith. The statements that a person acts in good faith if "he honestly intends to carry out his promises" are very similar and substantially track the district court's "good faith" instruction located above the court's reliance on counsel instruction in the charge.

7. The defendant proposed the following instruction on "Good Faith":

The words "fraud," "fraudulent," or "defrauding" mean to trick, deceive, injure, or damage in some way.

A statement which is untrue or a representation which is false rises to the level of "fraud" when the person making it knew the statement to be untrue or knew the representations to be false at the time that the statement or representation was made.

A statement which is untrue or a representation which is false may also rise the level of "fraud" when the person making the statement or making the representation is acting with the intent to trick, deceive, injure, or damage or is making the statement or representation with reckless indifference to its truth, accuracy, or falsity.

If you find that the evidence has established beyond a reasonable doubt that the Defendant acted with a fraudulent intent, or said another way, an intent to defraud, it is unimportant whether the Defendant was successful and accomplished his plan or was unsuccessful and did not accomplish it. It is not necessary for the government to prove that anybody was actually defrauded or that a defendant actually profited by any fraudulent transaction.

On the other hand, even though some individual may have lost money in the transactions shown by the evidence, this does not rise to the level of fraud unless the evidence establishes beyond a reasonable doubt that the transaction was designed and intended by the defendant to deceive, or trick, or injury, or damage.

An honest belief or "good faith" belief by the Defendant that the statements or representations made were true is a complete and total defense to the charge of securities fraud in Count 1 of the Indictment because such an honest or "good faith" belief is absolutely inconsistent with a fraudulent intent.

If the jury has a reasonable doubt as to whether the Defendant acted with an intent to defraud or acted in good faith, the jury may acquit the Defendant. 2 Edward J. Devitt, et al, *Federal Jury Practice and Instructions* § 52.15 (West 4th ed. 1990).

tion on securities fraud in the book *Federal Jury Practice and Instructions*.

The district court rejected the defendant's "good faith" charge and issued a charge more specifically tailored to the facts of this case.[8] The charge chosen by the district court was significantly shorter than the one requested by the defendant and did not focus nearly as closely on the idea that, as long as Peterson believed what he said was true, he lacked the requisite intent. Despite this, the court's charge, when taken as a whole, does make this point clear. Moreover, the district court's instructions on good faith addressed an important point favoring the defendant but which was not included in the defendant's charge. Specifically, the court instructed the jury that the defendant "has no burden to come forward with evidence to establish a defense of good faith."

We are not unmindful of the difficulties a district court faces when trying to craft a jury charge which can be easily understood by a lay juror while properly and thoroughly explaining complex points of law. This is precisely why an abuse of discretion standard is applied in these instances by appellate courts. The district court in this case choose to draft a shorter charge on good faith which was carefully tailored to fit the facts of this particular case.

After a review of the charge as a whole, we find that the district court did not abuse its discretion in rejecting Peterson's proposed instruction. It is substantially covered in the charge given to the jury. *See id.*

## C. Application of the Sentencing Guidelines.

On September 29, 1996, J. Chandler Peterson appeared before the district court for sentencing. Prior to sentencing the district court had determined, with the help of the probation department, the defendant's applicable offense level and criminal history category using the United States Sentencing Guidelines (U.S.S.G.). The district court concluded that Peterson's offense level was 19 with a criminal history category of I (one).

The district court's conclusion involved the following analysis. First, pursuant to U.S.S.G. § 1B1.2(a) the district court determined that the offense guideline section in Chapter Two of the U.S.S.G. which was most applicable to the offense of conviction, in this case a Rule 10b–5 violation, was Part F dealing with offenses involving fraud or deceit. Therefore, Peterson's base offense level was six (6). *See* U.S.S.G. § 2F1.1(a). After this determination was made, the district court turned to the specific offense characteristics of the instant offense. *See* U.S.S.G. § 1B1.2(b); U.S.S.G. § 2F1.1(b). The defendant received a two point increase for more than minimal planning and a two point increase for his role in the offense.[9] *See* U.S.S.G. § 2F1.1(b)(2)(A); U.S.S.G. § 3B1.3. Finally, the district court considered the amount of loss which had occurred in this case so as to determine if there should be an offense level increase pursuant to U.S.S.G. § 2F1.1(b)(1).

The Pre–Sentence Investigation Report (PSR), adopted by the district court as its findings on this point, on page 10, para-

---

8. The court's jury instructions of good faith were as follows:

Misrepresentations or omissions of material fact do not violate the law under which the Defendant is charged unless they are made with the intent to defraud. With respect to finding the Defendant guilty based on a misrepresentation or omission of material facts, the Defendant's good faith belief in the truth of statements made by him is a defense however inaccurate or misleading the statements or omissions turn out to be.

*The Defendant has no burden to come forward with evidence to establish a defense of good faith.* The burden is on the government to prove the intent to defraud with respect to misrepresentations or omissions of material fact beyond a reasonable doubt.

In considering whether or not the Defendant acted in good faith, you are instructed that a belief by the Defendant, if such belief existed, that ultimately everything would work out so that no one would lose money does not require a finding by you that he acted in good faith. No amount of honest belief on the part of the Defendant that the investment will ultimately succeed will excuse misrepresentations or omissions of material fact made with the intent to obtain money or something of value (emphasis added).

9. These increases were not objected to by the defendant at the time of sentencing and are not before this court on appeal.

graphs 41 through 43 found that the total loss attributable to the defendant's conduct was $1,413,142.00 which called for a nine (9) level increase in the defendant's offense level. U.S.S.G. 2F1.1(b)(1)(J). The district court used two figures to come to this conclusion. First, evidence at trial showed that the defendant has promised Local 195 an "immediate" $100,000 return on their initial investment. Instead, Local 195 only received a $45,558 distribution from the defendant. Thus Local 195 was never provided with the additional $54,442. The district court found that the defendant had no intention of providing Local 195 with the balance and thus used this figure in calculating the loss attributable to the defendant's offense of conviction.

The second figure used by the court concerned allegations by other ABFL investors, as well as Local 195, that Peterson had been diverting ABFL funds for his personal use for a number of years. This information came to light as a result of the May 1989 civil suit filed by ABFL investors in Georgia. Evidence from this civil suit showed that Peterson had failed to distribute at least $1,358,700.00 in ABFL funds. The district court determined this loss resulted from "relevant conduct" to the offense of conviction and was properly included in the PSR's amount of loss determination. *See* U.S.S.G. § 1B1.3(a)(1) and (a)(2).

The defendant filed a timely objection to the use of both figures in the district court's amount of loss calculation and this aspect of the district court's guideline application is now before us on appeal.

■ The district court's application of the Sentencing Guidelines is reviewed *de novo*. *United States v. Dean*, 59 F.3d 1479, 1494 (5th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 794, 133 L.Ed.2d 742 (1996). However, the sentencing court's findings of fact are reviewed for clear error. *Id.* A district court's determination of the amount of loss is a factual finding which we, therefore, review for clear error. *United States v. Brown*, 7 F.3d 1155, 1159 (5th Cir.1993). Similarly, a district courts findings as to what constitutes relevant conduct is reviewed under a clearly

erroneous standard. *United States v. McCaskey*, 9 F.3d 368, 376 (5th Cir.1993).

■ We turn to the $54,442 amount of loss determination first. This amount is clearly related to the offense of conviction. The defendant was convicted of a Rule 10b–5 violation in that he made a misrepresentation in connection with the sale of a security. The evidence showed that one of the misrepresentations made by the defendant concerned the amount of "immediate" return Local 195 would receive. Subsequently, Local 195 received less than half of the "immediate" return promised by the defendant. The evidence supports the district court's finding that Peterson never intended to give Local 195 the $54,442 and that this represents an actual loss to the victim arising from conduct relevant to the offense of conviction. U.S.S.G. § 2F1.1, comment. (n. 7).

The defendant argues that there was no actual or intended loss to Local 195. In some respects the defendant is correct. Local 195 has continued to participate in ABFL and has to date received a total of $562,-202.00 in returns on their initial investment. While this is true, the defendant ignores the fact that for the entire period in which Local 195 was a limited partner in ABFL and Peterson controlled its funds Local 195 only received $45,558 in returns. The year after Peterson was removed and ABFL placed into receivership Local 195 collected $413,784.00 in returns. The defendant's argument that he simply reinvested the other $54,442 rings hollow in light of the facts. The money received by Local 195 since 1989 has not been because of the defendant but despite him. Again, it was not clearly erroneous for the district court to use the figure of $54,442 in its amount of loss calculation in this case.

The $1,358,700 figure represents a closer question for this court and requires us to take an in depth look at what exactly is relevant conduct under the U.S.S.G. The concept of relevant conduct was developed out of the conflict within the Sentencing Commission as to whether to have a "real offense" system or a "charge offense" system. The real offense concept, which predates the guidelines, involves sentencing the defendant for the actual conduct the individu-

al engaged in regardless of the offense of conviction or indictment. U.S.S.G. Ch. 1, pt. A(4)(a); *See also United States v. Fox*, 889 F.2d 357, 361 (1st Cir.1989) (discussing the pre-guidelines practice of taking into account conduct relevant to the offense of conviction). The charge offense theory entails sentencing the individual based solely on the elements of the offense to which the defendant is charged and convicted. *Id.* While the Commission did eventually settle upon a model closer to the charge offense system the guidelines contain a number of real offense elements. *See United States v. Guerrero*, 863 F.2d 245, 248 (2nd Cir.1988).

One of these real offense elements is relevant conduct. U.S.S.G. § 1B1.3. More specifically, § 1B1.3(a)(2) provides that a defendant's offense level may be determined on the basis of "... all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction ..." Relevant conduct allows sentencing courts to consider the factors surrounding the offense of conviction within the framework of the guidelines thus allowing the courts to maintain some of their pre-guidelines discretion.

 While the $1,358,700 allegedly loss because of the defendant's actions does result from activity related to the offense of conviction so as to be possibly considered "relevant conduct" for guideline purposes, there has been no determination made that this activity was in any way criminal. For conduct to be considered "relevant conduct" for the purpose of establishing ones offense level that conduct must be criminal. *United States v. Dickler*, 64 F.3d 818, 830–1 (3rd Cir.1995); *United States v. Sheahan*, 31 F.3d 595, 600 (8th Cir.1994).[10] To hold otherwise would allow individuals to be punished by having their guideline range increased for activity which is not prohibited by law but merely morally distasteful or viewed as simply wrong by the sentencing court.[11]

 In the instant matter, the district court made no determination as to whether the defendant's conduct with regard to the $1.3 million loss to ABFL was actually criminal conduct rather than a violation of the fiduciary agreement making the defendant civilly liable to the ABFL investors. While a civil suit regarding this money was filed by investors in the Fund, no determination of criminal activity has been made as a result of this suit. Additionally, no criminal charges have arisen as a result of this activity. Moreover, it is clear from the PSR that at best the loss of this money involved a "grey area" in which lawyers intimately involved with the Fund were unsure. It is equally unclear whether Peterson could have accepted the $1.3 million as "investment banking fees" or refused to distribute this money legally under the existing agreement. The conduct involved here could very well have been provided for under the agreement or at least not disallowed.

This matter is remanded for re-sentencing at which time the sentencing court shall determine whether the $1,358,700 loss resulted from *criminal* conduct of the defendant. If criminal, then is this conduct relevant to the offense of conviction so as to constitute "relevant conduct" for guidelines purposes.

III

CONCLUSION

For the foregoing reasons, the defendant's conviction is affirmed and his sentence vacat-

---

**10.** This Circuit has touched on this requirement that relevant conduct be criminal conduct, without specifically holding as such, in *United States v. Bethley*, 973 F.2d 396, 401 (5th Cir.1992), *cert. denied*, 507 U.S. 935, 113 S.Ct. 1323, 122 L.Ed.2d 709 (1993) (quoting, *United States v. Santiago*, 906 F.2d 867, 872 (2nd Cir.1990)).

**11.** Some Circuits allow non-criminal conduct to be considered by the sentencing court when awarding credit for acceptance of responsibility under U.S.S.G. § 3E1.1. *See United States v.*

*Atlas*, 94 F.3d 447, 451 (8th Cir.1996); *United States v. Marvin*, 28 F.3d 663, 666 (7th Cir.1994); *United States v. Oliveras*, 905 F.2d 623, 630 (2nd Cir.1990).

Conversely, this Circuit has held that only relevant criminal conduct may be used in determining a defendant's acceptance of responsibility under § 3E1.1 which is directly in line with the holding of this case. *United States v. Mourning*, 914 F.2d 699, 705–6 (5th Cir.1990).

ed and this matter remanded for re-sentencing.