**Revised July 28, 1999**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

Nos. 97-21031
97-20237

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

KARL L. DAHLSTROM AND KARLA D. DAHLSTROM,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas

_____
July 13, 1999

Before KING, Chief Judge, REYNALDO G. GARZA, and JOLLY, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

Karl Dahlstrom ("Dahlstrom") and his daughter, Karla Dahlstrom (collectively "the Dahlstroms"), appeal their convictions and sentences for securities laws violations.

In February of 1991, Dahlstrom approached Richard Beeman ("Beeman"), a business associate, to discuss the production and marketing of Uni-snuff, a gel like substance designed to extinguish oil well fires like the ones raging in Kuwait at the time. Prompted by their discussion, Beeman organized a group of

twenty to twenty-five potential investors in Boise, Idaho, for a meeting with Dahlstrom.

At the meeting, Dahlstrom demonstrated the product by showing a videotaped recording of the product putting out a mock oil well fire. He explained that as a result of Saddam Hussain's invasion of Kuwait, the Kuwaity government had expressed an interest in Uni-snuff and that he was looking for investors who would invest a minimum of $10,000. He stated at the meeting that the product's ingredients were approved by the Environmental Protection Agency ("EPA"), that the product was going to be studied by a professor at Louisiana State University, and that contracts for the sale of Uni-snuff were currently pending in Kuwait. He failed to disclose the risks involved with the investment, primarily, that the product's shelf life rendered it commercially useless.

Approximately ten of the investors gathered at the Boise meeting decided to invest in the product. On April 10, 1991, Dahlstrom incorporated Inferno Snuffers, Inc. ("ISI") for the sole purpose of producing and marketing Uni-snuff. On April 19, 1991, ISI signed a six-month lease for office space and lab facilities for $19,000. The office and lab facilities were in a complex owned by Dahlstrom in Bryan, College Station. Tension grew as costly expansions were made to the facility, company vehicles were bought, and large salaries were paid without the investors' approval.

2

Dahlstrom authorized demonstrations and encouraged the selling of securities to meet the ever increasing need for investment money. Although prior attempts to market the product in Mexico and in Kuwait had failed, investors were told that the product was out of the prototype stage and that it had been successfully tested on all types of fires. Dahlstrom was aware that the product would separate and rot if it remained in a mixed solution for a few days. He had also been informed that mixing the components at the scene of an actual fire had been overly burdensome and impractical. A report by one of the officers also showed that, although a freshly mixed batch of Uni-snuff would put out regular fires on land, the product did not perform as expected on oil well fires. Despite this information, Dahlstrom continued to hold demonstrations at ISI's facility and covered-up for the product's deficiencies by mixing a fresh batch of Uni-snuff on a daily basis. Investors and contract brokers were continuously reassured that the product was commercially viable.

Karla Dahlstrom was in charge of sending promotional material to potential investors. The literature falsely stated that the company had contracts with two fire fighting companies, when in fact it had negotiated with two contract brokers who were trying to secure a sales contract for ISI. One of the documents falsely stated that the product absorbed enormous amounts of heat without dissipating, which was not true because it evaporated at the same temperature as water. The materials also stated that

3

the flashpoint of the product greatly exceeded the melting point of aluminum, which was also not true.  Claims were made that the product was nontoxic and environmentally safe, however, samples of the product had never been sent to the EPA and there was no data to support this conclusion.  Videotapes of the product were continuously used as promotional material to attract investors.  The recordings falsely stated that the product had passed Kuwait inspections and that it was the only fire fighting chemical approved by the Kuwait Oil Company.  Investors were told that multi-million dollar contracts were being negotiated with potential buyers and that a patent was pending.  Except for a few investors who went to the laboratory and saw the product rotting away, most of the investors and contract brokers were misled into believing that the product was in fact commercially viable and that all of Dahlstrom's assertions were true.

By July of 1991, ISI had exceeded the number of investors permitted under securities laws for non-registered corporations.  Rather than turning investors away, investors were placed into trusts.  Richard Lopez, who had previously applied for a license to sell public securities, became concerned that the "piggybacking" scheme was illegal and informed the Dahlstroms about his concerns.  Karla Dahlstrom, who was in charge of placing the investors in the trusts, complained that she was signing documents that Dahlstrom did not want to sign.  Dahlstrom argued that the thirty-five investor limit could be circumvented

4

by placing the added investors into trusts and that it was a grey area of the law that could never be proven.[1]

Concerns regarding the unregistered sales of securities by non-brokers also grew as more people invested and commissions were paid. Two ISI employees informed Dahlstrom that a license was required if the person selling the securities received a fee. Dahlstrom tried to circumvent the law by designating the commissions as "consulting fees." Don Ballard ("Ballard"), who had three million shares of ISI, was paid 10% commission fee off of the $80,000 to $100,000 he raised for ISI through a trust. Thirty to forty investors were placed under Ballard's family trust though they had no relationship to Ballard. Dahlstrom hoped to remedy this problem later by merging with a public corporation.

In September of 1991, Dahlstrom received a letter from the State Securities Board advising him that it had information that ISI was offering and selling securities to the general public. The letter advised that under Texas law, securities offered for sale to the general public had to be registered and sold by registered dealers, unless an exemption could be found. The letter also advised that the antifraud provisions of the

---

[1]Inferno Engineering ("IEC") was incorporated on July 10, 1991. Dahlstrom created the company to allow for an additional thirty-five investors because ISI had already reached its thirty-five investor limit under securities laws. The companies, however, were intermingled and ISI and IEC were in reality the same company.

5

Securities Act applied to the offer and sale of securities and to all statements and representations in connection therewith.

Shortly after receiving the letter from the State Securities Board, Dahlstrom's attorney suggested that they stop selling stock until they received proper advise from a competent securities attorney. A meeting that same month with a law firm undeniably revealed that the money had been raised improperly and that a recision offer was needed. The firm informed both Dahlstrom and Karla Dahlstrom that they had to stop piggybacking new investors and that the problem with the product's shelf life had to be fully disclosed. Furthermore, investors should be given the opportunity to either: (1) sell back their stock to ISI; or (2) keep their investment after the disclosure was made.

Despite counsel's advice, Dahlstrom and Karla Dahlstrom continued to sell securities through November and October of 1991. An audit later that year revealed that the company had raised $1.6 million by selling stock through September 30, 1997, and another $.0458 million through December of 1991. There was a total of 706 investors who resided in twenty-five different states. The audit reflected no sales of the product for the company and a net loss through December of 1991, of $1,036,279 and $2,114,143 through April of 1992. It wasn't until April of 1992 that a formal recision offer was made available to stockholders. The company, however, did not have enough money to fund the recision offer.

6

The Dahlstrom were indicted on August 14, 1996, for committing fraud in connection with the purchase and sale of securities and in the offer and sale of securities ("Count II and III"); for selling unregistered securities ("Count IV"); for acting as an unregistered broker or dealer in the sale or purchase of securities ("Count V"); for mail fraud ("Count VI through Count XVI"); and for conspiracy to commit the same violations ("Count I") in violation of 15 U.S.C. §§ 77e(a) and (c), 77q(a), 78o(a)(1), 78j(b), and 18 U.S.C. §§ 2, 371, 1341. The jury convicted Dahlstrom on Counts II through VI, Counts IX though XIV, and XVI. Karla Dahlstrom was convicted on Counts IV and V. Dahlstrom was sentenced to seventy-eight months imprisonment on Count II and sixty months on the remaining counts, to run concurrently. Karla Dahlstrom was sentenced to forty-six months imprisonment. The Dahlstroms were ordered to jointly pay $1,997,003 in restitution.

This appeal followed.

I.

On May 11, 1992, a group of ISI employees and a Sheriff arrived at the Dahlstroms' place of business. The ISI employees forced themselves into Karla Dahlstrom's office and proceeded to remove ISI property. The Dahlstroms argue that the bulk of the documentary evidence used against them at trial was illegally seized in violation of their Fourth Amendment rights. They

7

contend that the Sheriff's presence gave the unauthorized act an air of legality and that this inhibited their attempts to retain control of the documents. The Dahlstroms also assert that the district court erred in finding that the ISI employees were not acting as agents or instruments of the government.

This Court has treated a district court's determination of whether a person is acting as a government agent as a factual finding. *United States v. Blocker*, 104 F.3d 720, 725 (5th Cir. 1997)(citing *United States v. Jenkins*, 46 F.3d 447, 460 (5th Cir. 1994)). We review the denial of a motion to suppress the district court's factual findings under the clearly erroneous standard and its conclusion of law *de novo*. *United States v. Bloker* 104 F.3d at 725 (citation omitted). A factual finding is clearly erroneous if after reviewing the entire evidence this Court is left with a firm conviction that a mistake has been committed. *Id*. n.2, (citing *Anderson v. City of Vessemer City, N.C.*, 470 U.S. 564, 573 (1985)).

The Fourth Amendment applies only to government action. Evidence that is retrieved by a private individual may be admitted at a criminal trial. *Walter v. United States*, 447 U.S. 649, 656 (1980). It may be determined, however, that an individual acted on behalf of the state or as an agent or instrument of the state if the record shows that: (1) the government has offered the individual some form of compensation

8

for the search; (2) if the individual did not initiate the idea on his own that he would conduct the search; and (3) the government knew that the individual intended a search. *United States v. Ramirez*, 810 F.2d 1338, 1342 (5th Cir.), *cert. denied sub nom. Alegria-Valencia v. United States*, 481 U.S. 1072 (1987)(citing *United States v. Bazan, Jr.*, 807 F.2d 1200, 1204 (5th Cir. 1986)).

The Dahlstroms argue that their case is similar to the Seventh Circuit case, *Soldal v. Cook County, Illinois*, 506 U.S. 56, 62 (1992), where the Supreme Court held that the unauthorized towing of a mobile home constituted a Fourth Amendment violation. In *Soldal*, the Supreme Court specifically declined to address the Seventh Circuit's determination that the individuals' actions constituted state action. *Id.* at n.6. The Supreme Court reviewed the Fourth Amendment issue on the premise that the state had removed the mobile home from its location without a warrant.

After reviewing the district court's decision and record, we find no evidence supporting the argument that the ISI employees acted as agents of the state. The individuals conceived the plan on their own and solely for their own benefit. The officer's presence was merely requested to keep the peace. In addition, the government did not acquire possession of the documents until much later through proper discovery proceedings. Therefore, we find no evidence supportive of the Dahlstroms' argument that the

9

ISI employees and the Sheriff colluded to seize the documents. Accordingly, we hold that the Dahlstroms' Fourth Amendment rights were not violated.

## II.

The second issue on appeal is whether the involvement of the same attorney who represented the Securities and Exchange Commission ("SEC") in a underlying civil action warrants a reversal of the convictions in this case. SEC attorney Phillip W. Offill, Jr. ("Offill") had previously represented the SEC in a civil action arising from the same facts. An agreed judgment was entered in that case which required Dahlstrom to pay approximately $307,122. A criminal indictment was then presented by United States Attorney Gaynelle Griffin Jones, by an through Assistant United States Attorney Quincy L. Ollison. Offill contributed in the government's prosecution of the Dahlstroms. The Dahlstroms maintain that Offill's participation constitutes plain error due to an appearance of impropriety by his in-depth participation. They argue that Offill's participation violates their right to prosecution by an impartial prosecutor.

We review whether Offill's participation in the criminal proceedings warrants reversal for plain error. *United States v. Carter*, 907 F.2d 484, 488 (5th Cir. 1990). Reversal for plain error is appropriate only where the alleged error was obvious,

substantial, and, if not corrected, would seriously affect the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Morrow*, No. 96-50958, 1999 WL 329712, at *3 (5th Cir. May 25, 1999).

In *Young v. United States ex rel. Vuitton et Fils. S.A.,* 481 U.S. 787 (1987), the Supreme Court addressed a similar issue. The Court reversed the Second Circuit because the district court appointed as a special prosecutor the same attorney who had previously filed a trademark infringement claim against the defendants. *Id*. at 791. The Court noted that a prosecutor's duties is to represent the United States and not the party that is the beneficiary of the court order allegedly violated. *Id*. at 804. In *Young*, the court noted that "[t]he prosecutor is appointed solely to pursue the public interest in vindication of the court's authority." *Id.* Given that the prosecutor may be swayed by other interests due to a conflict in roles, the Court held that counsel for a party that is the beneficiary of a court order may not be appointed as prosecutor in a contempt action alleging a violation of that order. *Id.* at 808.

In *United States ex rel. S.E.C. v. Carter*, 907 F.2d 484 (5th Cir. 1990), we reversed the district court because it appointed as special prosecutors the same attorneys who had previously represented the SEC in the underlying civil action. In light of Supreme Court's holding in *Young*, we turned to the Ninth

11

Circuit's holding in *FTC v. American National Cellular,* 868 F.2d 315 (9th Cir. 1989) for guidance. In *American National Cellular*, the Ninth Circuit implemented a two-factor test in resolving that a Federal Trade Commission attorney, who had served in both the civil and the criminal case, had in fact served the public interest and not a private interest. *Id*. at 318. The two factors considered in reaching this decision were: (1) the level of participation by the U.S. Attorney; and (2) the extent of the particular agency attorney's involvement in the underlying civil suit. *Id.* We consider, once again, the Ninth Circuit's test in determining whether Offill's participation in the criminal and underlying civil suit violated the Dahlstroms' rights to an impartial prosecutor.

Although the record shows that Offill had participated intensely in the civil suit, this Court is unconvinced that he retained control over the prosecution. As stated in *Carter*, we consider whether the prosecuting attorney may have been tempted to pursue nonmeritorious claims in exchange for useful information in their underlying civil litigation. *Carter*, 907 F.2d at 487. In the case before us, it is clear that the United States Attorney's Office ("USAO") was in control of this case and that Offill's participation does not merit its reversal. In *Carter*, the SEC attorney was the final decision maker and in full control of the prosecution's case. *Id*. at 488. In the present

12

case, the record shows that criminal prosecution was initiated by the USAO and that Offill was essentially assisting a disinterested prosecutor. The Supreme Court states in *Young*, "[t]he familiarity may be put to use in assisting a disinterested prosecutor in pursing the contempt action, but cannot justify permitting counsel for the private party to be in control of the prosecution." *Young*, 481 U.S. at 806. Since Offill did not have control of the prosecution, we hold that the Dahlstroms' rights were not violated by Offill's participation in their criminal prosecution.

## III.

The third issue raised on appeal deals with the sufficiency of the evidence pertaining to the following counts: Counts II, fraud in the connection with both the purchase and sale of securities; Count III, fraud in the offer and sale of securities; Count IV, the selling of unregistered securities; Count V, acting as unregistered broker dealers; and Counts VI-XVI, mail fraud violations in regard to Counts II and III.

This Court will not disturb a jury's verdict "unless the record demonstrates that a rational jury could not have found each of the elements of the offense beyond a reasonable doubt." *United States v. Peterson*, 101 F.3d 378, 379 (5th Cir. 1996), *cert. denied*, 520 U.S. 1161 (1997). In applying this standard,

13

we must view the evidence, and all inferences reasonably drawn from it, in the light most favorable to the verdict, regardless of whether the conviction is based on direct or circumstantial evidence. *Id.* (citing *United States v. Ruggiero,* 56 F.3d 647, 654 (5th Cir.), *cert denied sub nom. Parker v. United States*, 516 U.S. 951 (1995)).

A review of the record evidence, pertaining to each of the points raised by the Dahlstroms in their briefs and oral argument, reveals that the evidence was sufficient to support the jury's verdict on each of the counts charged. Therefore, we are unwilling to disturb the jury's verdict.

IV.

Dahlstrom argues that the district court erred by allowing Elena Szilagyi ("Szilagyi") to testify about another of Dahlstrom's investment funded companies. The evidence was admitted as proof of Dahlstrom's knowledge of securities law and the absence of a good-faith mistake. The district judge gave a standard 404(b) instruction, telling the jury to only consider the evidence to determine intent or motive. Szilagyi described how Dahlstrom raised money from investors for a company Dahlstrom created called OWPEC by demonstrating a chemical formula she developed to dissolve paraffin in oil fields. She testified that OWPEC was funded by investors shortly after the Exxon Valdez oil

14

spill and that OWPEC was merged with another company in order to take the stock public. Dahlstrom argues that the prejudicial effect of the testimony outweighs the probative value of the testimony. Thus, he maintains that this case must be granted a new trial.

This Court reviews a district court's ruling regarding the admissibility of evidence for abuse of discretion and will reverse a district court's ruling only if it affects a substantial right of a party. *United States v. Ramirez*, No. 97-11208, 1999 WL 261638 at *4 (5th Cir. May 3, 1999).

In order to be admissible under the Federal Rule of Evidence 404(b), the evidence of the defendant's prior bad acts must be: (1) relevant to some issue other than the defendant's character; and (2) its probative value must be greater than its potential to unfairly prejudice the jury. *United States v. Gonzalez-Lira*, 936 F.2d 184, 189 (5th Cir. 1991) (citing *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978)(en banc), *cert. denied*, 440 U.S. 920 (1979)).

A review of the record reveals that the admitted testimony demonstrates a scheme almost identical to the Uni-snuff plan. The similarity between the plans is probative of Dahlstrom's knowledge or intent while he was actively seeking funding from investors through ISI. Due to these similarities, coupled with the fact that the district court specifically instructed the jury

15

that the testimony was admissible only as to evidence of a common scheme or plan and not as to Dahlstrom's character, the evidence was in fact more probative than it was prejudicial. Therefore, we hold that the district court did not abuse its discretion by allowing Szilagyi's testimony into court.

V.

Dahlstrom asserts on appeal that the district court erred by assessing $1,997,003 against him and by finding that he had abused a position of trust. Dahlstrom maintains that a twelve point increase in the presentence report ("PSR") was erroneous because the appropriate amount of loss was $145,320. This represents the amount he personally received as wages and as expense reimbursements. Dahlstrom's principal contention is that ISI and IEC were not worthless companies, and therefore the district judge should have offset their value against the deposited amounts. He argues against a two point increase in the PSR by stating that his control over ISI and IEC should not be determinative of the trust issue. Dahlstrom contends that the enhancement should not be applied because he did not owe nor breach any fiduciary duties.

A sentencing court's factual findings are reviewed for clear error. *See United States v. Navarez*, 38 F.3d 162, 166 (5th Cir. 1994), *cert. denied*, 514 U.S. 1087 (1995). As long as the

16

finding is plausible in light of the record as a whole, it is not clearly erroneous. *United States v. Sowels*, 998 F.2d 249, 251 (5th Cir. 1993), *cert. denied*, 510 U.S. 1121 (1994). Interpretations of the Sentencing Guidelines are reviewed *de novo. See United States v. Thomas*, 973 F.2d 1152 (5th Cir. 1992).

In *United States v. Oates*, 122 F.3d 222, 225 (5th Cir. 1997), we stated, "[t]his Court has long adhered to the view, supported by the relevant application note, that the amount of loss for the purpose of determining a base offense level in United States Sentencing Guidelines § 2F1.1(b)(1) is the dollar amount placed at risk by a defendant's fraudulent scheme or artifice." We interpret comment number seven of § 2F.1 as specifically stating that the defendant will be held responsible for the amount of injury he attempted to inflict, even if that loss is greater than the actual loss. *Id*.

As to the two point increase for Dahlstrom's position of trust within the company, we determine that an abuse of position of trust is imposed if a defendant's job places the defendant in a superior position to commit a crime and the defendant takes advantage of that superior position to facilitate a crime. *United States v. Brown*, 7 F.3d 1155, 1161 (5th Cir. 1993). In this case, Dahlstrom occupied a position of trust as president and CEO of ISI. His unique position contributed to the

17

commission and concealment of the crimes and toward the misallocation of ISI's investment money. Dahlstrom breached his fiduciary duty to the investors by failing to disclose the blatant legal problems that afflicted ISI and by failing to disclose the commercial ineffectiveness of the product.

Accordingly, we hold that the district court did not abuse its discretion by attributing a twelve point increase against Dahlstrom for the money that was put at risk of loss and a two point increase for the position he held within the company.

## VI.

The final issue on appeal is whether the district court erred by ordering that Dahlstrom and Karla Dahlstrom each pay a total of $1,997,003 in restitution fees. The government argues that the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, authorizes restitution when the subject offense involves a scheme, conspiracy, or pattern of criminal activity. The Dahlstroms contend that there is no legal basis for the district court's orders and that even if § 3663 were applicable, there is insufficient evidence to show that they were involved in a common plan or scheme to defraud the investors.

We review the legality of the district court's order of restitution *de novo*. *United States v. Hughey* 147 F.3d 423, 436 (5th Cir.), *cert. denied*, 119 S.Ct. 569 (1998)(citing *United*

18

*States v. Chaney*, 964 F.2d 437, 451 (5th Cir. 1992)). "Once we have determined that an award of restitution is permitted by the appropriate law, we review the propriety of a particular award for abuse of discretion." *Id.*

A review of the record demonstrates that all of ISI's investors were victims of a common scheme to be defrauded. We note that although in two of Dahlstrom's counts he was acquitted, there is an overwhelming amount of evidence that shows that all of the investors were affected by Dahlstrom's actions. Since the whole of the investors shared a common interest in ISI and the evidence is sufficient to establish that Dahlstrom's actions affected all of their investments, we conclude that a common plan to defraud existed. Therefore, we hold that the district court did not abuse its discretion by ordering Dahlstrom to pay restitution.

A review of the record shows that Karla Dahlstrom is subject to a supervised release as part of her sentence. In *United States v. Bok*, 156 F.3d 157, 166 (2d. Cir. 1998), the court determined that although restitution may not be directly permitted under § 3663(a), a district court may order restitution within the context of a supervised release. Title 18 U.S.C. § 3583(d) explicitly provides that the court may order, as a further condition of supervised release, "any condition set forth as discretionary condition of probation in § 3563(b)(1) through

19

(b)(10) and (b)(12) through (b)(20), and any other condition it considers to be appropriate." 18 U.S.C. § 3583(d). One of the discretionary conditions referred to in § 3563(b) is the requirement that the defendant make restitution to a victim of the offense. 18 U.S.C. § 3563(b)(2). The Second Circuit interpreted §§ 3583(d) and 3563(b) to permit a restitution award regardless of the limitations set out in § 3663(a). *Id*. We agree with the Second Circuit's rationale.

In light of the fact that Karla Dahlstrom is subject to a supervised release, and the presence of evidence in the record supporting the finding that she was involved in a common plan or scheme to defraud the investors, we hold that the district court did not abuse its discretion by ordering her to pay restitution to the victims.

Accordingly, for the aforementioned reasons, we AFFIRM the district court's decision in all respects.