IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 16, 2008

Charles R. Fulbruge III
Clerk

No. 07-20455

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Plaintiff – Appellee

v.

BRUCE E. SNYDER, JR.

Defendant – Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:03-CV-4658

Before SMITH, WIENER, and HAYNES, Circuit Judges.

PER CURIAM:[*]

This case involves civil securities fraud allegations against Defendant-Appellant Bruce Snyder, the former vice president and chief accounting officer of Waste Management, Inc. ("WMI"). The Securities and Exchange Commission ("SEC") alleged that Snyder filed a materially false and misleading Form 10-Q for the first quarter of 1999 because it overstated income and included certain "nonrecurring" adjustments to income without appropriate

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

disclosure. The SEC also alleged that Snyder committed insider trading when he sold stock after filing the allegedly false Form 10-Q.

Snyder argued to the jury that he did not act with scienter because he reasonably believed that the overstated income was immaterial and that the adjustments were recurring and need not have been disclosed. Snyder established that WMI's outside accountant, Arthur Andersen ("AA"), conducted an unaudited review of the 10-Q before it was filed. Snyder argued that if outside accountants believed the disclosures in the 10-Q were adequate, he was not severely reckless for believing the same.

After a four week trial, the jury returned a verdict against Snyder on all claims. Snyder asks this court to reverse and render a judgment in his favor, or in the alternative, for a new trial. Finding error in the jury instructions, we REVERSE and REMAND for a new trial.

## I. BACKGROUND

On July 16, 1998, USA Waste Services, Inc., completed a merger with Waste Management, Inc. to create WMI. Snyder was chief accounting officer of the merged company. The company was organized into five geographic operating areas, each of which was overseen by an area vice president.

Following the merger, WMI reaffirmed its earnings outlook for 1999, saying it expected earnings to be $3.00 to $3.05 per share for the year. Rod Proto, WMI's chief operating officer, scheduled a meeting in mid-November 1998 to discuss the company's budget for 1999. The chief executive officer, chief financial officer, five area vice presidents, Proto, and Snyder attended the meeting. The financial results discussed during the meeting were disappointing. Although the company predicted earnings per share of $3.00 to $3.05 for 1999, the area vice presidents projected earnings totaling only $1.98 per share. Several of the areas reported first quarter results that would be tens of millions of dollars below their respective targets. The area vice presidents described the

targets as aggressive and very difficult to achieve. Proto pressed the area vice presidents to get to $2.92 per share for the year.

On April 26, 1999, Proto organized a conference call with Snyder and the area vice presidents to discuss the first quarter numbers in advance of a May 6 call with investors. Proto indicated during the call that investors expected earnings of close to sixty cents per share for the first quarter. Snyder's notes of the call indicate that Proto said "we need help now" and "we need operating results, not just journal entries." They also discussed the anticipated second quarter performance during the call. Three of the four area vice presidents who were on the call predicted significant shortfalls from their second quarter budget targets. Snyder's handwritten notes from the call reflect that the projected revenue for WMI's second quarter was running short by $110 million, or eleven cents per share. Snyder wrote "Acctg Solutions?" in the margin next to his discussion of the shortfall.

On May 13, 1999, Snyder signed WMI's Form 10-Q for the first quarter of 1999, which was then filed with the SEC. WMI stated in the Form 10-Q that its earnings per share for the first quarter would be sixty-one cents per share, only one cent short of market expectations. WMI's Form 10-Q for the first quarter of 1999 formed the basis of the SEC's case against Snyder. Four days after signing the Form 10-Q, Snyder sold 5500 shares of WMI stock.

The preparation of the financial statements in the Form 10-Q was governed by generally accepted accounting principles ("GAAP"), including the SEC's Regulation S-X. 17 C.F.R. § 210 (2006). If a company's earnings include adjustments that are not normal and recurring, that fact had to be disclosed in the financial statements under Regulation S-X even though they are appropriately accounted for as income in the financial statements. Among other things, Regulation S-X provided:

> Any unaudited interim financial statements furnished shall reflect all adjustments which are, in the opinion of management, necessary to a fair statement of the results for the interim periods presented. . . . If all such adjustments are of a normal recurring nature, a statement to that effect shall be made; otherwise, there shall be furnished information describing in appropriate detail the nature and amount of any adjustments other than normal recurring adjustments entering into the determination of the results shown.

17 C.F.R. § 210.10-01(b)(8) (emphasis added).

The management discussion and analysis ("MD&A") in the Form 10-Q, which was separate from the financial statements, was governed by Item 303 of Regulation S-K. 17 C.F.R. § 229.303 (2006). Instruction 4 to Paragraph (b) of Item 303 provided that the company's "discussion of material changes in results of operations shall identify any significant elements of the registrant's income or loss from continuing operations which do not arise from or are not necessarily representative of the registrant's ongoing business." Id.

The SEC argued to the jury that the Form 10-Q overstated WMI's income and contained undisclosed nonrecurring accounting adjustments intended to close the gap between investor expectations and WMI's true financial performance. The accounting adjustments can be divided into two categories: (1) adjustments identified by WMI's outside accountants as troublesome before Snyder signed the Form 10-Q; and (2) adjustments about which AA raised no concerns before the Form 10-Q was signed.

### a. Accounting Adjustments Identified by WMI's Outside Accountants as Troublesome Before Snyder Signed the Form 10-Q

AA, WMI's outside accountant, was hired to perform a quarterly review in connection with WMI's first quarter Form 10-Q for 1999. In that role, AA performed an unaudited review of WMI's first quarter 1999 financial results, including a review of WMI's journal entries, to determine if there were any questions. If it disagreed with WMI's accounting treatment or had a question,

4

AA would make proposed adjusting journal entries ("PAJEs"), which are proposed revisions to the financial statements.

AA proposed five PAJEs in connection with its review of the first quarter Form 10-Q, four of which would have reduced WMI's reported income if adopted. Although the fifth PAJE would have increased WMI's reported income if adopted, the SEC argued that the entire adjustment, including the increase proposed by WMI, should have been disclosed as nonrecurring.

PAJE 1: Change in life of burners. The first PAJE related to a change in the estimate of the useful life of certain waste-to-energy plants. AA concluded that $5.7 million of the adjustment related to a prior period and should not have been included in first quarter income.

PAJE 2: Change in treatment of outage costs. The second PAJE related to an income adjustment associated with a change in how WMI accounted for certain costs that were incurred when WMI's plants were annually shut down for repairs and maintenance. AA concluded that $2.2 million of the adjustment related to a prior period and should not have been included in first quarter income.

PAJE 3: Conforming landfill entries. The third PAJE related to three landfills operated by Whellabrator Technologies, Inc. ("WTI") prior to the USA Waste/Old Waste merger. WTI made an adjustment because the landfills had been accounted for in a way that was different from all of WMI's other landfills, and WMI decided to conform the accounting to its other landfills. AA concluded that the $20.3 million adjustment should have been recorded under "Merger Costs and Unusual Items" rather than as a reduction of operating costs.

PAJE 4: Change in landfill reserves. The fourth PAJE involved a change in estimates to certain reserves at two landfills. AA concluded that adjustments made to two landfills were to closure or post-closure reserves, but that WMI had improperly recorded the adjustment on a cumulative basis rather than

accounting for the adjustment prospectively. This adjustment increased income by $12.1 million.

After WMI reviewed AA's PAJEs, WMI "elected to pass the entries." AA's first four proposed adjustments would have reduced WMI's reported income by $40.3 million. The fifth PAJE would have increased WMI's income by $10 million, but as discussed below, that increase was to an accounting adjustment that the SEC contends should have been disclosed as nonrecurring. Snyder determined that the accounting errors identified by AA were immaterial to WMI's total reported income. AA concurred that "the passing of these entries does not have the effect of making the Company's consolidated financial statements materially misleading." On May 6, 1999, AA issued its "Report of Independent Public Accountants," explaining that it had reviewed WMI's financial statements. Based on its review (and with full knowledge that WMI had passed on the PAJEs), AA gave a "negative assurance" that it was "not aware of any material modifications that should be made to the financial statements referred to above for them to be in conformity with generally accepted accounting principles."

### b. Accounting Adjustments About Which AA Raised No Concerns Before the Form 10-Q Was Signed

After Snyder signed the Form 10-Q for the first quarter of 1999, WMI continued to be concerned that it would not meet its earnings forecast for the second quarter. After another meeting to discuss WMI's financial performance on June 9, 1999, Snyder exercised options to acquire 8700 shares and instructed the broker to sell 2700 of the shares.

On July 6, 1999, WMI issued a press release advising that it had lowered its earnings projections for the second quarter and for the full year. WMI further lowered its second quarter projections downward in a July 29, 1999 press release. WMI's stock price plummeted.

WMI's board created an Executive Committee to investigate the missed projections. Ralph Whitworth, chairman of the board, became aware that certain "soft" items included in the second quarter projections did not relate to WMI's ongoing business, but instead related to accounting changes or nonrecurring items. He asked Snyder to come up with a list of similar income items that were included in WMI's first quarter reported income.

Snyder created a list of accounting adjustments in August 1999 titled "Nonrecurring adjustments," which was admitted during trial as Exhibit 92. The adjustments listed in Exhibit 92 totaled $101 million of reported income for WMI in the first quarter of 1999 and were not disclosed in the Form 10-Q. Both Snyder and AA were aware of all the adjustments listed in Exhibit 92 when Snyder signed the Form 10-Q for the first quarter of 1999. In addition to the four PAJEs discussed above, Snyder listed three other accounting adjustments under the title "Nonrecurring adjustments."

Reduction of Reserves for Seven Eastern Area Landfills. After listing the four PAJEs discussed above, the fifth adjustment identified on Exhibit 92 was made up of seven individual adjustments to reserves for landfills in the company's eastern area, adding $24 million to WMI's first quarter pre-tax earnings. Although AA was aware of this adjustment in connection with its first quarter review, it did not flag it for correction. John King, an AA audit manager, testified that it was only after being asked to do additional procedures by WMI's board of directors later that summer (around the time that Exhibit 92 was created) that AA "became aware of new and different facts that ultimately led us to conclude that the adjustments—or some portion of the adjustments were inappropriate."

For several landfills WMI reduced closure or post-closure reserves, but it did not account for them prospectively. According to King, the "accounting was inappropriate" and not representative of the company's ongoing business.

Another two landfills, Cuyahoga and Deep Valley, had been closed and then reopened. WMI reversed its closure/post-closure reserves. AA agreed that some reversal was appropriate but not to the extent the company had taken it. King testified that the adjustment was not representative of WMI's ongoing business. In the case of two landfills, DSI and East Kentucky, there appears to be no explanation for the adjustments.

Change in Accounting for Vickery Deepwell. The sixth adjustment identified on Exhibit 92 was a change in accounting for a landfill called Vickery Deepwell. WMI changed its accounting from viewing two facilities as separate to viewing them as one integrated facility. According to King, the resulting $12 million increase in pre-tax earnings was a "unique" event, and not representative of ongoing business. Stephen Brown, an AA partner, agreed that the adjustment made to the Vickery reserve was "an example of something that's a nonrecurring adjustment to a reserve."

Reduction of International Environmental Reserves. The seventh adjustment identified on Exhibit 92 pertained to a reduction of environmental reserves for foreign sites that had not been reviewed for more than five years. The adjustment added $25 million to operating income. Charles Williams, WMI's vice president of environmental engineering, testified that typically the company looked at the reserves quarterly, and that five years was a "very long period of time to us." This was a "special case and something that probably would not repeat itself."

The SEC argued to the jury that these three categories of accounting adjustments should have been disclosed as nonrecurring in the first quarter Form 10-Q.

On August 3, 1999, WMI issued another press release:

An ongoing review, with our independent auditors, is being made of the recording in the first quarter of 1999 of remedial reserves for landfills and other assets managed as part of the International

operating unit and by the Eastern Area of the Company's North American operations, and of changes made in the residual values of landfills formerly managed by Whellabrator Technologies, Inc. This review may demonstrate that approximately $95 million ($0.09 diluted EPS) of non-recurring pretax income items were included in operating income (as reported and as adjusted) for the quarter ended March 31, 1999. The results of this review will be discussed in the Company's August 16, 1999 filings with the SEC. Depending on the outcome of the review, the Company may restate its Form 10-Q for the period ended March 31, 1999.

The adjustments identified on Exhibit 92 and discussed above were then reviewed by AA. The results of the investigation were reported in an August 16, 1999 press release and in WMI's second quarter Form 10-Q, which disclosed that WMI overstated its first quarter income by $30.2 million, slightly less than the total amount of overstated income identified by AA in the PAJEs. In addition, the MD&A stated that "[f]or the six months ending June 30, 1999, operating costs and expenses were favorably impacted by $58 million in the three months ended March 31, 1999 attributable to downward revisions in remediation liabilities to certain of the Company's operations." Of this $58 million, $23 million was "attributable to revisions of reserves associated with the Company's Eastern Area" and $35 million was "attributable to revisions of remediation liabilities associated with the Company's international operations."

The SEC sued Snyder claiming that WMI's first quarter Form 10-Q mistated WMI's income and failed to disclose a material amount of nonrecurring adjustments, in violation of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5, and that he aided and abetted WMI's filing of a materially false and misleading Form 10-Q for the first quarter of 1999, in violation of Section 20(e) of the Exchange Act. The SEC also alleged that Snyder committed insider trading in violation of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Exchange Act, and SEC Rule 10b-5 in connection with two sales of WMI stock that occurred after he signed and filed

the materially misleading first quarter Form 10-Q. Snyder argued to the jury that he did not act with scienter because three outside accountants believed the disclosures in the Form 10-Q were adequate.

After a four week trial, the jury found that Snyder filed a materially false and misleading Form 10-Q and that he aided and abetted WMI's filing of a materially false and misleading Form 10-Q. The jury also found that Snyder committed insider trading when he sold WMI stock on May 17, 1999 and on June 9, 1999. After the verdict, Snyder moved for judgment as a matter of law, contending that reasonable jurors could not have reached those verdicts based on the evidence presented. The district court denied Snyder's motion, finding that the record contained sufficient evidence to support the jury verdicts and emphasizing that the court's role was not to make credibility determinations or weigh the evidence.

Snyder now appeals the final judgment entered against him.

## II. DISCUSSION

Snyder argues that there was no evidence supporting the jury's finding of scienter and requests this court to reverse and render judgment in his favor on all claims. In the alternative, Snyder argues that a new trial is required because of erroneous jury instructions. We address each issue in turn.

## A. Sufficiency of the Evidence

We first address whether the SEC produced sufficient evidence to support the jury's finding that Snyder acted with scienter. Snyder argues his motion for judgment as a matter of law should have been granted because the accounting errors identified by AA before the Form 10-Q was filed were immaterial and both he and AA reasonably believed that the other adjustments identified by the SEC were recurring and did not need to be disclosed. We hold that there was sufficient evidence to support the jury's findings that Snyder acted with scienter.

This court reviews the denial of a motion for judgment as a matter of law de novo. Evans v. Ford Motor Co., 484 F.3d 329, 334 (5th Cir. 2007). "'Although our review is de novo, . . . our standard of review with respect to a jury verdict is especially deferential.'" Id. (alteration in original) (quoting Flowers v. S. Reg'l Physician Servs. Inc., 247 F.3d 229, 235 (5th Cir. 2001)). We review "all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party." Id. This court "'may not make credibility determinations or weigh the evidence.'" Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). Thus, in reviewing the record as a whole, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Id. "[J]udgment as a matter of law should only be granted if 'the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion.'" Coffel v. Stryker Corp., 284 F.3d 625, 630 (5th Cir. 2002) (quoting Flowers, 247 F.3d at 235).

In order to establish that Snyder is liable, either for filing a false or misleading Form 10-Q, or for aiding and abetting WMI's filing of the Form 10-Q, the SEC had to show that he acted with scienter, "'a mental state embracing intent to deceive, manipulate, or defraud.'" Goldstein v. MCI Worldcom, 340 F.3d 238, 245 (5th Cir. 2003) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)). The scienter element can be satisfied by a showing of "severe recklessness." Id. This court has repeated the definition of severe recklessness for this circuit on several occasions:

> those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Id. at 245-46 (internal quotation marks omitted); Abrams v. Baker Hughes Inc., 292 F.3d 424, 430 (5th Cir. 2002); Nathenson v. Zonagen Inc., 267 F.3d 400, 408 (5th Cir. 2001); see also Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961 (5th Cir. 1981) (en banc). Snyder contends that this Court should apply a "no reasonable accountant" formulation of the severe recklessness standard, which was adopted by the court in SEC v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992). We decline to adopt an explicit "no reasonable accountant" requirement and, instead, apply this court's well established definition of severe recklessness.

Snyder is correct that the SEC cannot satisfy its burden of proving scienter by demonstrating that he was aware of some accounting errors that, with the benefit of hindsight, turned out to be significant. The SEC had the burden of proving that Snyder acted with scienter with regard to both the truth and the materiality of the allegedly misleading statements. See Fine v. Am. Solar King Corp., 919 F.2d 290, 297 (5th Cir. 1990) ("[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information.").

Snyder argues that the SEC proved only that he was aware of $40.3 million of improperly reported income identified by AA in the PAJEs, which he contends was not clearly material. Snyder contends there was no evidence that he was severely reckless in failing to disclose the other $61 million of accounting adjustments that the SEC argued were nonrecurring. Without the allegedly nonrecurring accounting adjustments, Snyder claims there is no evidence that he acted with severe recklessness with regard to a material amount of WMI's income.

Even assuming that the improperly reported income identified by AA in the PAJEs was immaterial by itself, there was sufficient evidence to support the jury's findings. The SEC offered abundant evidence that Snyder acted with

12

severe recklessness in not disclosing the accounting adjustments alleged to have been nonrecurring. In the aggregate, the accounting errors identified by AA in the PAJEs and the alleged nonrecurring accounting adjustments that were not disclosed total more than $101 million. This total amount was obviously material, which Snyder does not dispute.

The SEC's evidence of scienter consisted primarily of the expert testimony of Sally L. Hoffman, a Certified Public Accountant and Certified Fraud Examiner, as well as a number of documents to which Hoffman referred. Hoffman opined that the nondisclosure of certain adjustments to income in the footnotes and MD&A section of WMI's Form 10-Q for the first quarter of 1999 made the Form 10-Q materially misleading. Hoffman testified that, to someone with Snyder's training, education, information, and experience with WMI, it would have been obvious that not disclosing these adjustments in the Form 10-Q rendered it materially misleading. Although Snyder asserts that Hoffman's opinion was conclusional,[1] Hoffman testified as to the particular accounting rules that required disclosure of certain adjustments in WMI's Form 10-Q, the nature of these adjustments, the reasons why the applicable rules required disclosure of these specific adjustments, and how the nondisclosure of these adjustments rendered the Form 10-Q false and misleading.

---

[1] Many of Snyder's arguments appear to be belated attempts to challenge the admissibility of Hoffman's opinions under FED. R. EVID. 702 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), rather than challenges to the sufficiency of the evidence. Because Snyder did not object to the admissibility of Hoffman's testimony concerning the accounting practices at issue, that issue has been forfeited. Foradori v. Harris, 523 F.3d 477, 508 (5th Cir. 2008). Nonetheless, this court looks "to the basis of the expert's opinion, and not the bare opinion alone," to determine whether there is legally sufficient evidence to support a jury verdict. Guile v. United States, 422 F.3d 221, 227 (5th Cir. 2005) (internal quotation marks omitted); see also Stevenson v. E.I. DuPont De Nemours & Co., 327 F.3d 400, 406 (5th Cir. 2003). Our review of expert testimony for sufficiency of the evidence is not as rigorous as it would be under a properly preserved challenge to the admissibility of the testimony under Daubert. See In re Joint E. & S. Dist. Asbestos Litig., 52 F.3d 1124, 1132-33 (2d Cir. 1995). In the present case, Hoffman's testimony was clearly supported by the evidence.

SEC's Exhibit 82A is one example of information known to Snyder prior to the filing of the Form 10-Q, and consists of an April 26, 1999 memorandum sent to Snyder and other WMI officers.[2] It contains a list of "closure/post closure adjustments" for WMI's eastern area, totaling approximately $47.3 million in the aggregate. Hoffman testified that changes in closure and post-closure costs are types of adjustments that are not representative of WMI's regular business, and that the adjustments listed in Exhibit 82A were notable because they all increased WMI's income. Hoffman testified that this exhibit would have raised a red flag for Snyder that WMI's income from the eastern area included approximately $47.3 million in adjustments that were not representative of WMI's usual business, and which, when aggregated with other adjustments, would need to be disclosed in the Form 10-Q.

Snyder argues that Hoffman's testimony relating to Exhibit 82A is based upon erroneous and conclusional assumptions. He claims that Hoffman based her conclusion that the $47.3 million consisted of adjustments to closure and post-closure costs on the fact that the list was titled "Closure/Post Closure Adjustments," rather than on her own research into the nature of WMI's eastern area adjustments. Snyder asserts that the eastern area adjustments were adjustments to remediation reserves appropriately accounted for as income in the first quarter. Snyder also asserts that Hoffman's testimony is illogical because, if Hoffman were correct that the adjustments shown in Exhibit 82A were adjustments to closure/post-closure costs, then AA should have listed all $47.3 million as PAJEs. Snyder further urges that Hoffman's testimony relating to Exhibit 82A is contradicted by AA's conclusion that $23 million of the eastern area adjustments were properly made to WMI's environmental remediation

---

[2] Although we discuss Snyder's attacks on the evidence document by document, as the parties have in their briefs, we note that our decision is based on the evidence as a whole and is not a decision concerning the validity of each independent piece of evidence. United States v. Garza, 990 F.2d 171, 175 (5th Cir. 1993).

reserves. Each of these arguments goes to the credibility and weight to be accorded Hoffman's testimony, not to the sufficiency of the evidence. See Coffel, 284 F.3d at 631. That Hoffman based her opinion on the assumption that Exhibit 82A meant what it said is not a basis for reversal.

In addition to Exhibit 82A, Hoffman discussed the SEC's Exhibit 88, another schedule of eastern area adjustments, this time totaling approximately $70 million. Hoffman testified that the descriptions of the items on this schedule as "correction[s] of error" and the terms "correct" and "correcting" show that these items were corrections of error, which, when aggregated with other adjustments, were required to be disclosed. Hoffman opined that Snyder's knowledge of these "correction" entries should have made it obvious to him that the adjustments had to be disclosed in the Form 10-Q.

Snyder contends that Hoffman's characterization of all of the items as corrections of error mistakenly rests upon the description of only one item (relating to the Vickery Deepwell landfill) as a "correction of error." Snyder asserts that Hoffman's characterization of the adjustments is contradicted by AA's conclusions that almost all of the eastern area adjustments related to remediation reserves and would not require disclosure.

Hoffman's testimony and the exhibit itself constitute circumstantial evidence that Snyder knew that at least some of the adjustments should be characterized as corrections of error, which should have been disclosed in the Form 10-Q if material when aggregated with other adjustments. Snyder's remaining arguments again go to the credibility and weight of Hoffman's testimony and do not warrant reversal.

Additionally, Hoffman testified that the SEC's Exhibit 92, a list of "Nonrecurring adjustments" prepared by Snyder after the filing of the Form 10-Q, showed that Snyder was aware that several adjustments to WMI's income were not representative of WMI's ongoing business, and that these adjustments,

when aggregated, were material to WMI's first quarter 1999 income. Hoffman testified that each of the adjustments should have been disclosed because they were nonrecurring, regardless of whether the adjustments were proper. According to Hoffman's testimony, it would have been obvious to an accountant with Snyder's training that these adjustments, which were not representative of WMI's regular business, were material in the aggregate and were required to be disclosed in the Form 10-Q.

Snyder contends that there is no evidence that he ever believed that items five through seven listed in Exhibit 92 were unusual items that were required to be disclosed, or that the failure to disclose these items was an extreme departure from the ordinary standard of care. This argument ignores the circumstantial evidence produced at trial. Snyder personally typed Exhibit 92, including the title "Nonrecurring adjustments." Although Snyder argues that Exhibit 92 was really just a list of things he thought the board might want to investigate, the jury was free to disregard his explanation and believe that Snyder meant what he wrote when he described the adjustments as "nonrecurring." Hoffman testified at length as to each item listed in Exhibit 92, reaching the conclusion that each item was not representative of WMI's usual and ongoing business. Accountants at AA also provided testimony that the adjustments listed on Exhibit 92 were not representative of WMI's ongoing business and should have been disclosed.

In addition to the documents discussed above, the SEC offered substantial evidence that Snyder was motivated to mislead WMI investors into believing that WMI was performing at analysts' expectations, and that he thought accounting adjustments like those discussed in Exhibit 92 could help make up for anticipated shortfalls. For example, the SEC introduced Snyder's handwritten notes from an April 26, 1999 discussion with WMI's area vice presidents and other officers as evidence of his awareness that the first quarter

adjustments had boosted WMI's earnings. On the final page of the notes, Snyder wrote that "we need operating results, not just JEs," which he testified referred to journal entries, like the adjustments listed in Exhibit 92. Similarly, the SEC referred to Snyder's discussion of the anticipated shortfall and a notation of "Acctg Solutions?" in the margin of the page.

To rebut the SEC's evidence, Snyder points to the testimony of AA accountants John King, Steve Brown, and Phil Wedemeyer, who testified that they did not believe WMI's Form 10-Q was materially false or misleading. As part of their engagement with WMI, the AA accountants read the entire first quarter Form 10-Q before it was filed, including the financial statements, footnotes, and the MD&A. After this review, AA issued its Report of Independent Public Accountants, which stated that, "[b]ased on our review, we are not aware of any material modifications that should be made to the financial statements . . . for them to be in conformity with generally accepted accounting principles."

Snyder argues that AA's approval of the Form 10-Q is fatal to the SEC's case because it demonstrates that reasonable accountants could find that the Form 10-Q was not materially misleading, and therefore, that Snyder could not have acted with severe recklessness. We disagree. AA's review of the Form 10-Q was limited and involved no analysis of whether all required disclosures had been made in the MD&A section. In addition, the jury also could have found the testimony of AA's accountants to be less credible than the evidence offered by the SEC, or it could have concluded that AA was itself severely reckless.

Additionally, Snyder's contentions that AA later concluded that some of the adjustments were "appropriately accounted for as income in the first quarter" and "agreed with WMI's treatment of Vickery Deepwell as an adjustment to remediation reserves properly taken as income in the first quarter 1999" may indicate that AA agreed that the adjustments could be included in

WMI's income, but they say nothing about whether the adjustments needed to be disclosed as nonrecurring. The obligation to disclose nonrecurring adjustments presupposes that the adjustments were appropriately included in income in the first place.

Snyder also relies on WMI's subsequent revision of the first quarter numbers. He asserts that the revised numbers reduced income by only a net of $30.2 million, an immaterial amount. He says the company determined that all the other adjustments, including the $58 million in adjustments to the eastern area reserves and the international environmental covenant, were "normal recurring adjustments." Snynder ignores that the company also moved another $14 million to "merger costs," which meant they were effectively reclassified as nonrecurring. In addition, the jury was free to disregard WMI's description of the adjustments. It certainly is possible that the jury did not view WMI's description of the adjustments as credible, particularly because WMI ultimately decided that it needed to disclose the $58 million in adjustments despite the fact that it described them as "normal" and "recurring."

Bearing in mind our obligation to draw all reasonable inferences in favor of the jury's verdict, AA's role in the preparation of WMI's Form 10-Q and AA's lack of disagreement with Snyder do not mandate a judgment in Snyder's favor. Accordingly, we hold that the SEC presented legally sufficient evidence to support the jury's findings that Snyder acted with the requisite scienter in filing the first quarter Form 10-Q.

Scienter is also an element of an insider trading case. See Dirks v. SEC, 463 U.S. 646, 664 n.23 (1983). Snyder argues that because there is no evidence that he acted with scienter in filing the Form 10-Q, then he also did not have scienter with regards to his sales of WMI stock. As discussed above, we hold that there was sufficient evidence that Snyder acted with scienter in filing the first quarter Form 10-Q. When drawing all reasonable inferences in favor of the

SEC, the jury could have concluded that Snyder sold WMI stock with knowledge that the first quarter Form 10-Q materially inflated WMI's income and earnings.

In addition to knowing that the income reported in the Form 10-Q was inflated and included undisclosed nonrecurring adjustments, Snyder was also aware from the April 26, 1999 call that four of the five area vice presidents were predicting that they would miss their earnings targets in the second quarter. Snyder's notes calculated an eleven cent per share shortfall, which represented a thirteen percent drop from the company's target of eighty-two cents for the second quarter. Snyder attended a May 3, 1999 meeting during which similar projections were discussed just two weeks before his May 17, 1999 sale of WMI stock.

Snyder argues that the projections were not final and cannot form the basis of an insider trading claim, relying on two securities class actions from the Seventh Circuit, In re HealthCare Compare Corp. Sec. Litigation, 75 F.3d 276 (7th Cir. 1996) and Searls v. Glasser, 64 F.3d 1061 (7th Cir. 1995). In those cases, the court considered whether tentative estimates and loose predictions were sufficiently certain and reliable to require immediate disclosure by the company. In re HealthCare, 75 F.3d at 282; Searls, 64 F.3d at 1067. Neither case concerned insider trading.

The cases cited by Snyder are inapposite because they do not excuse his failure to disclose the misstated income and nonrecurring adjustments contained in the first quarter Form 10-Q, which was final when he sold WMI stock. In addition, this court has held that forecasts may be material. SEC v. Fox, 855 F.2d 247, 253 (5th Cir. 1988). As we held in Fox, "the determination of materiality 'requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.'" Id. (quoting SEC v. Mize, 615 F.2d 1046, 1053 (5th Cir. 1980). We held

in Fox that the fact that insiders had access to certain forecasts "would have supported a finding of materiality." Id. In the present case, the jury was entitled to find that the predictions of significant shortfalls in the second quarter was information that a reasonable investor would have found important.

Snyder also argues that he could not have acted with scienter regarding his sale of WMI stock on June 9, 1999, although he attended a meeting to discuss WMI's financial performance the same day. Snyder sold 2,700 shares of WMI stock, but he exercised 8,700 options to purchase WMI stock, for a net purchase of 6,000 shares. Although his net purchase is some evidence tending to show that he did not sell stock on June 9, 1999 on the basis of material, nonpublic information about WMI's negative financial performance, the facts and inferences do not point so strongly and overwhelmingly in Snyder's favor that reasonable jurors could not reach a contrary conclusion. For these same reasons, we also hold that the verdict was not against the great weight of the evidence. See Shows v. Jamison Bedding, Inc., 671 F.2d 927, 931 (5th Cir. 1982)(To grant a new trial, the district judge "must be convinced that the verdict is against the great weight of the evidence.").

## B. Jury Instructions

Snyder argues that the district court erred by instructing the jury that it was his burden to prove certain "elements" of a reliance-on-accountants defense before the jury could consider his reliance on AA to negate scienter. The SEC, citing authority from two other circuits, asserts that the district court's instruction was appropriate. Because the district court's instruction was an incorrect statement of the law in this circuit and could have affected the outcome of the case, we reverse and remand for a new trial.

District courts enjoy substantial latitude in formulating jury instructions. United States v. Jobe, 101 F.3d 1046, 1059 (5th Cir. 1996). This court applies a two-part test in considering a challenge to the district court's jury instructions.

20

"The party challenging the instructions must first 'demonstrate that the charge as a whole creates a substantial and ineradicable doubt whether the jury has been properly guided in its deliberations.'" Navigant Consulting, Inc. v. Wilkinson, 508 F.3d 277, 293 (5th Cir. 2007) (quoting Russell v. Plano Bank & Trust, 130 F.3d 715, 719 (5th Cir. 1997)). "Second, even where a jury instruction was erroneous, 'we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case.'" Id.

A central theme of Snyder's defense was AA's knowledge of the accounting adjustments and Snyder's purported reliance on AA's review of WMI's financial statements for compliance with GAAP. Snyder argued that if it was not obvious to AA that disclosure of the adjustments was required in the footnotes, it could not have been obvious to Snyder.

The district court instructed the jury as follows:

In this case, Mr. Snyder has presented evidence that, in connection with WMI's preparation of the Form 10-Q for the first quarter 1999, he relied on the advice of other accountants. A good faith reliance on an accountant's advice is not a defense to securities fraud. It simply represents possible evidence of an absence of any intent to defraud.

Mr. Snyder was only entitled to rely on an accountant's advice if he establishes each of the following facts by a preponderance of the evidence (note that it is Mr. Snyder who has the burden of proof on these elements):

1. That Mr. Snyder informed the accountants of all relevant facts;

2. That Mr. Snyder did not misrepresent any relevant facts to the accountants;

3. That the accountants were asked to give a specific opinion about the particular point that Mr. Snyder claims he relied on;

21

4. That the accountants actually gave a specific opinion about the particular point that Mr. Snyder claims he relied on.

Snyder objected to the instruction, pointing out that he had "never asserted this narrow, affirmative defense" and that it was improper to require him to adduce specific proof that he asked for and received from AA a specific opinion on the particular point.[3] Snyder offered an alternative instruction that stated as follows:

> A good faith reliance on an accountant's advice is not a defense to securities fraud. It simply represents possible evidence of an absence of any intent to defraud. To decide whether any such reliance was in good faith, you may consider whether Mr. Snyder sought the advice of a competent accountant concerning the material facts allegedly omitted or misrepresented, whether Mr. Snyder gave the accountant all the relevant facts known to him at the time, and whether Mr. Snyder received an opinion from his accountant that he could reasonably rely upon.

The district court's instruction was in error. In United States v. Peterson, 101 F.3d 375 (5th Cir. 1996), this court recognized that reliance on counsel's advice is not an affirmative defense. Id. at 381. Rather, "[i]t is simply a means of demonstrating good faith and represents possible evidence of an absence of any intent to defraud." Id. In so holding, the court approved of an instruction that provided as follows:

---

[3] Although we conclude that Snyder preserved error, an issue not raised by the SEC in its brief, we note that this was a very close case. Snyder never specifically stated that the district court's instruction improperly shifted the burden of proof. Under FED. R. CIV. P. 51, a party must object to a proposed jury instruction, "stating distinctly the matter objected to and the grounds for the objection." FED. R. CIV. P. 51(c)(1). The "'objection must be sufficiently specific to bring into focus the precise nature of the alleged error.'" Navigant Consulting, 508 F.3d at 294 (quoting Delancey v. Motichek Towing Serv., Inc., 427 F.2d 897, 900 (5th Cir.1970)). Snyder stated in his written objection that he was relying on AA only to rebut the testimony of Hoffman. Snyder raised similar objections during the charging conference in response to the SEC's contention that Snyder had the burden of proof. Given the context of Snyder's objection and the fact that he directed the court to the appropriate legal authority, we hold that the assertion that he was not raising an affirmative defense was sufficiently specific to bring into focus the nature of the alleged error.

> Reliance on the advice of an attorney may constitute good faith. To decide whether such reliance was in good faith, you may consider whether the Defendant sought the advice of a competent attorney concerning the material fact allegedly omitted or misrepresented, whether the Defendant gave his attorney all the relevant facts known to him at the time, whether the Defendant received an opinion from his attorney, whether the Defendant believed the opinion was given in good faith and whether the defendant reasonably followed the opinion.

Id. at 381 n.5 (emphasis omitted).

We find no meaningful distinction between the reliance on counsel and reliance on an accountant. Both defensive theories provide an explanation of the defendant's conduct tending to negate the element of scienter. Under both theories, the jury is free to decide for itself whether the facts demonstrate that the defendant acted with scienter in light of the advice he received from his attorneys or accountants. The defendant does not have the burden of proving any "elements" of the defense before the jury can weigh the defendant's theory of reliance. However, a district court may suggest relevant factors that the jury may consider in its deliberations, such as the instruction approved in Peterson.

The cases cited by the SEC do not support placing the burden on Snyder before the jury may consider his reliance on outside accountants. In United States v. Duncan, 850 F.2d 1104 (6th Cir. 1988), overruled on other grounds by Schad v. Arizona, 501 U.S. 624 (1991), the court recognized two elements that a defendant must show before he is entitled to a jury instruction concerning reliance on accountants, but the court did not shift the burden of proof to the defendant in the jury instruction itself. Id. at 1116. The issue was whether the district court erred in providing no instruction to the jury concerning advice of counsel. Id. The Sixth Circuit held that the district court did err in failing to provide an instruction. Id. at 1118-19.

The other case cited by the SEC, SEC v. Savoy Industries, Inc., 665 F.2d 1310 (D.C. Cir. 1981), did suggest in a footnote that the defendant bears the burden of proof and did list elements similar to the ones proposed by the SEC and adopted by the district court. 665 F.2d at 1315 n.28. But that case has since been repudiated by the same court that authored it. See Howard v. SEC, 376 F.3d 1136, 1147 (D.C. Cir. 2004) ("Despite dicta in [Savoy], reliance on the advice of counsel need not be a formal defense; it is simply evidence of good faith, a relevant consideration in evaluating a defendant's scienter.").

The SEC also suggests that Snyder cannot complain of the reliance on accountant instruction given to the jury because he requested a reliance on accountant instruction. The fact that Snyder asked for some instruction concerning reliance on accountants does not mean that the district court was free to shift the burden of proof to him.[4]

The erroneous instruction could have affected the outcome of this case. Snyder sought to rebut Hoffman's testimony that the need to disclose the first quarter adjustments was obvious and to support his defense that other reasonable accountants agreed with WMI's treatment of the first quarter adjustments. The court's instruction may have misled the jury by suggesting that the conclusions of the AA accountants were not relevant to scienter unless Snyder proved by a preponderance of the evidence that he specifically sought and received an express opinion from AA concerning the adjustments at issue. Thus, the jury may have rejected Snyder's theory of defense based on his failure to meet a burden of proof that was not his.

Although we reverse and remand for a new trial, we also address the remaining jury instruction issues raised by Snyder for reasons of economy. See United States v. Wright, 496 F.3d 371, 375 (5th Cir. 2007).

---

[4] The parties do not raise, and we do not reach, the issue of whether a reliance on accountant instruction was required in the present case.

Snyder argues that the district court improperly instructed the jury that the first quarter Form 10-Q was incorrect when it instructed the jury that it could not consider the second quarter Form 10-Q for purposes of Snyder's scienter. Snyder relied on the second quarter Form 10-Q as part of his defense, but he requested that the district court instruct the jury that it could not consider the second quarter revisions as evidence that (1) Snyder acted with scienter in the first quarter, or (2) WMI's first quarter Form 10-Q was materially misleading. The district court instructed the jury as follows:

> The parties agree that in August of 1999, WMI made certain revisions to its first quarter 1999 financial statements, including some additional disclosures regarding its first quarter results. You may not consider these disclosures as evidence that Mr. Snyder knew or recklessly disregarded that the original Form 10-Q was incorrect at the time that it was filed with the SEC.

The instruction given by the district court was not a clear abuse of discretion. The instruction informs the jury that it could not consider the second quarter Form 10-Q as evidence of scienter, as requested by Snyder.[5] Snyder argues that the instruction erroneously instructed the jury that the first quarter Form 10-Q was incorrect, but this does not create any doubt that the jury was properly guided in its deliberations. All the parties agreed that the first quarter Form 10-Q contained inaccuracies; this fact was never in dispute. The only issues were of Snyder's scienter and the need to disclose the alleged nonrecurring adjustments. In addition, the instruction does not state that the first quarter Form 10-Q was incorrect but only states "[y]ou may not consider these disclosures as evidence that Mr. Snyder knew or recklessly disregarded that the original Form 10-Q was incorrect." The question of whether the Form 10-Q was incorrect was left for the jury to decide.

---

[5] We do not reach the issue of whether such an instruction was necessary.

Snyder also argues that the district court erred by failing to charge the jury on the "no reasonable accountant" standard. Although Snyder asserts in his brief that the district court "declined, over Snyder's objections to instruct the jury on the 'no reasonable accountant' standard," Snyder's draft proposed jury instructions and objections to the district court's instructions contain no such objection. Snyder waived this claim by failing to object to the jury instruction as required by FED. R. CIV. P. 51(c). Even if Snyder had not waived his objection, the district court did not clearly abuse its discretion by instructing the jury on this circuit's well established "severe recklessness" standard.

Because we reverse the district court's judgment on the basis of an improper jury instruction, we do not reach Snyder's argument that the district court abused its discretion in ordering disgorgement.

## III. CONCLUSION

For the reasons discussed above, we REVERSE and REMAND for a new trial.